### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **ROBERT L. RHOADES, JR.,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 08-368-P-H** |
| | ) | |
| **DAVID WALSH, et al.,** | ) | |
| | ) | |
| **Defendants** | ) | |

### RECOMMENDED FINDINGS OF FACT
### AND CONCLUSIONS OF LAW

Plaintiff Robert L. Rhoades, Jr., moves pursuant to Federal Rule of Civil Procedure 55 and Local Rule 7 for a default judgment against defendants David Walsh and KW, a minor, on his negligence claim against them arising from a work-site accident in which he sustained a crush injury to his right leg when he was struck by a Bobcat tractor operated by KW.  *See* Motion for Default Judgment Against Defendants David Walsh and KW ("Motion") (Docket No. 9); Memorandum of Law in Support of Motion for Default Judgment (Docket No. 32) at 1; Complaint (Docket No. 1) ¶¶ 1-11.[1]

A motion for entry of default against Walsh and KW was granted on March 24, 2009. *See* Docket Nos. 10-11.  On July 23, 2009, following notice to Walsh and KW, a hearing as to damages was held before me at which the plaintiff appeared, represented by counsel, but no appearance was made by Walsh or KW.  The plaintiff and four other witnesses testified, and the plaintiff offered 10 exhibits that I admitted without objection.  *See* Witness List (Docket No. 35);

---

[1] A motion by a third defendant, Massachusetts Property Insurance Underwriting Association d/b/a Massachusetts Fair Plan ("MPIUA"), to dismiss the case against it was granted on April 16, 2009.  *See* Docket Nos. 8, 16.

Exhibit List (Docket No. 36). With the benefit of the hearing and exhibits, I recommend that the court grant the Motion and adopt the following proposed findings of fact and conclusions of law.

## I. Proposed Findings of Fact

### A. The Accident

1.     The plaintiff, who was born on October 23, 1982, began full-time employment with the George R. Roberts Company ("Roberts Co.") of Alfred, Maine in October 2006. He was paid $12.50 per hour plus overtime at time-and-a-half, or $18.75.

2.     Roberts Co. manufactures pre-cast concrete products. It also has a pump division that builds, tests, and installs pump systems, including wastewater systems. It has a regional presence, having undertaken jobs in Massachusetts, Vermont, New York, and beyond. Pump division jobs range from the installation of large commercial-size septic systems for malls and shopping centers to town fire cistern systems and culvert systems designed to provide drainage under roads.

3.     The plaintiff was assigned to Roberts Co.'s pump crew. The pump crew typically assembles pump systems at job sites and tests them following installation to ensure that they are working properly. Pump crew work is physically demanding, requiring constant movement into and out of holes that can be as much as 30 feet deep. Pump crew members must be certified to work in confined spaces and be physically capable of removing fellow workers from those spaces in the event of an emergency. Pump crew work also requires mechanical aptitude. The pump division typically generates the most revenue of Roberts Co.'s divisions, and its workers are among the company's elite.

4.     Roberts Co. strives to complete its pump system installations in one day if possible. As a result, particularly when traveling out of state, the pump crew can work as much

as a 16-hour day taking into account travel time.  On an annual basis, pump crew workers average 10 hours of overtime per week.[2]

5.      Although the plaintiff was only 24 as of October 23, 2006, he had already worked steadily for several years for different employers, including previously for Roberts Co.  While in high school, he worked during summers for the company, which employs his father.  During the school year, he also worked part-time after school at a Hannaford supermarket.  He dropped out of high school in the 11th grade to work full-time for Hannaford after he learned that his girlfriend, Robin, was pregnant.  After about a year at Hannaford, he took a full-time job at Roberts Co., where he worked for approximately six months.  He went on to work as a tire installer at VIP and then as a tire installer and automobile mechanic for Rowe Ford before rejoining Roberts Co. in October 2006.

6.      As of October 2006, the plaintiff was living with Robin, and the couple had two daughters, Jordan, who was three, and Schuyler, who was one.

7.      On November 4, 2006, the plaintiff and his former pump crew supervisor, Bob Burns, left Alfred in a Ford truck at approximately 4:15 a.m. to travel to a job site in Mashpee, Massachusetts.  Shortly before 9 a.m., they arrived at the job site and located the hole dug by the contractor, the Feeney Corporation, in which they were to install a pump system.

8.      The plaintiff noticed that a child approximately seven or eight years old was driving a Bobcat tractor, or skid steer, around the job site.  The child was KW, the son of David Walsh, a Feeney Corporation employee who had permitted his son to operate the Bobcat.

---

[2] This continues to hold true despite current economic conditions, thanks in part to an infusion of federal stimulus money for construction projects.

9.      The plaintiff had just obtained a hammer drill from the parked Ford truck when he turned to observe the Bobcat backing up straight toward him.  He was unable to get out of the way before the Bobcat grazed his abdomen and pinned his leg against the truck.

10.     KW leapt from the Bobcat.  The Bobcat, its treads still turning, pushed the plaintiff's leg even further into the truck.  Walsh reached the Bobcat and moved it away, freeing the plaintiff.  The plaintiff attempted to take a step and fell, whereupon Burns helped him up. The plaintiff heard a snapping and grinding noise and felt as though he were simultaneously exploding and numb, as though he had caught his finger in a door.[3]

11.     An ambulance quickly arrived on the scene.  A paramedic cut off the plaintiff's right boot, slit his pants leg up to his knee, looked at his leg, and said, "Oh, that's not good." While the plaintiff had no external bleeding, he had sustained serious internal injuries.

12.     The plaintiff was rushed to Mashpee Fire & Rescue headquarters, where he was transferred to a helicopter and air-lifted to Beth Israel Deaconess Medical Center ("Beth Israel") in Boston.  *See* Medical Records, Exh. 3 ("Records"), Vol. I(1)(A).  Paramedics noted that he had sustained a distal femur fracture with vascular compromise and a loss of distal pulses.  *See id*.  He was given an IV syringe that he assumed contained painkillers.

13.     The plaintiff began to realize the magnitude of his injury upon seeing that he was to be air-lifted to the hospital.  During the flight, a sheet covering his leg slipped off, and he observed, to his fright, that his leg was almost jet-black in color and his knee was the size of a volleyball.

14.     Paramedics assured him that he was going to be OK and administered more medication.  The next thing he remembers is waking up in the hospital following surgery and

---

[3] The Feeney Corporation later was fined by the Occupational Safety and Health Administration for permitting an unqualified, untrained individual to operate equipment.  *See* Exh. 8.

noticing scars on the insides of his thighs.  His father was at his bedside, as was Burns.  Robin was on her way there from Maine with a neighbor, after having arranged for babysitters for their daughters.

15.     The plaintiff's mother, Linda Harmon, who is very close to him, also rushed from Maine to his hospital bed in Boston after being informed that he had sustained a very serious injury, might not "make it," and might lose his leg.  She observed her son lying in a hospital bed in a great deal of pain, surrounded by electronic equipment, and fading in and out of consciousness.  In the days that followed, he appeared anxious, fearful, and depressed.

### B.  Medical Treatment and Expenses To Date

16.     Upon intake at Beth Israel, the plaintiff was noted to have sustained a crushing injury to his right leg, to be reporting pain of nine on a scale of 10, and to have no pulse in that leg.  *See id.*, Beth Israel Emergency Department Attending Note.  He was administered Fentanyl and morphine.  *See id.*

17.     He immediately underwent the first of five surgeries, a right superficial femoral artery to below-knee popliteal bypass graft, in which a vascular surgeon harvested a vein from his uninjured left leg and implanted it in his right leg to bypass his injured artery.  *See* Records, Vol. I(1)(B), Operative Report of Marc L. Schermerhorn, M.D., dated 11/4/06.  The vascular surgeon also ligated bleeding arteries and veins at the injury site.  *See id.*  An orthopedic surgeon then repaired a torn gracilis tendon and gastrocnemius.  *See* Records, Vol. I(1)(B), Operative Report of Paul Appleton, M.D., dated 11/4/06.[4]

18.     The following day, the plaintiff underwent a second surgery, a right calf fasciotomy times four compartments, to address a complication known as "compartment

---

[4] The gastrocnemius is a muscle in the calf.  *See* Stedman's Medical Dictionary ("Stedman's") 731 (27th ed. 2000).

syndrome." *See* Records, Vol. I(1)(B), Operative Report of Dr. Schermerhorn dated 11/5/06.[5]
Two incisions were made in the plaintiff's right leg, "and all 4 muscle compartments in the calf
were widely opened." *See id*. Following that procedure, the plaintiff's muscles temporarily
were left partially exposed to drain. He complained of "unbearable pain." *See* Records, Vol.
I(1)(E), Patient Notes dated 11/6/06 at 19:00; *see also* Records, Vol. I(1)(F), Nursing Note dated
11/6/06 at 19:00 (plaintiff complaining of pain of seven on a scale of 10 and at times "10/10+
pain"). He also developed anemia, requiring a blood transfusion. *See* Records, Vol. II(2)(A),
New England Rehabilitation Hospital of Portland ("New England Rehab") History and Physical.

19. On November 10, 2006, the plaintiff was deemed stable enough to undergo a third
surgery, to repair fractures of his right patella and distal femur that he had also sustained in the
accident. *See* Records, Vol. I(1)(B), Operative Report of Dr. Appleton dated 11/10/06.[6] The
plaintiff's orthopedic surgeon threaded surgical wire through the broken fragments of his knee to
reconstruct it, treated his femur fracture, and irrigated and closed his fasciotomy wounds. *See id*.

20. The surgical wire remained in the plaintiff's knee until September 2007. The
wire, which caused visible "knots" under his skin and appeared to him to be threatening to
protrude through it, caused severe pain and discomfort. During that time, he had to wear baggy
pants and was prescribed Lidocaine patches to cover the knots and help relieve the pain and
discomfort that they caused.

---

[5] A fasciotomy is an "[i]ncision through a fascia; used in the treatment of certain disorders and injuries when marked
swelling is present or anticipated which could compromise blood flow[.]" Stedman's at 653. A fascia is "[a] sheet
of fibrous tissue that envelops the body beneath the skin; it also encloses muscles and groups of muscles, and
separates their several layers or groups." *Id*. at 647.
[6] The plaintiff sustained a comminuted fracture of the patella, a medial femoral condyle fracture, and a minimally
depressed anterolateral tibial plateau fracture. *See* Records, Vol. I(1)(G), Department of Radiology report dated
11/6/06. The patella is the kneecap. *See* Stedman's at 1331. Comminuted means broken into several pieces. *See
id*. at 386. The femur is the long bone of the thigh. *See id*. at 655. The tibia is the medial and larger of the two
bones of the leg, also known as the shin bone. *See id*. at 1835.

21.     Following his third surgery, the plaintiff was in excruciating pain, his leg was swollen, and his temperature was elevated.  *See* Records, Vol. I(1)(E), Patient Notes dated 11/12/06 at 6:00 (plaintiff was noted to appear unhappy and to have complained that he was not getting good relief from Percocet) & Patient Notes dated 11/13/06 (plaintiff complaining of severe pain in legs; had temperature of 101.9 degrees).

22.     The plaintiff was discharged from Beth Israel on November 14, 2006, and transferred to New England Rehab in Portland, Maine.  *See* Records, Vol. II(2)(A).  His physical therapist was unable to complete an initial evaluation because of his reported spasms and pain of 10 on a scale of 10.  *See* Records, Vol. II(2)(C), HealthSouth Interdisciplinary Assessment Note dated 11/14/06.  The plaintiff later developed fever and chills, leading to his transfer on November 27, 2006, to Maine Medical Center ("MMC").  *See* Records, Vol. II(3)(A).  MMC's workups disclosed the presence of sepsis and a right knee infection with cultures positive for Enterobacter.  *See id.* & Vol. II(3)(B).[7]  Following approximately two weeks of inpatient hospitalization, the plaintiff was readmitted to New England Rehab on December 11, 2006.  *See* Records, Vol. II(2)(B).

23.     The complication of fever, chills, and infection was an added ordeal for the plaintiff.  At hearing, he recalled the discouragement of witnessing that his leg was purple and oozing a foul fluid from his surgical sites as technicians attempted to aspirate it to determine the cause of his fever.  Upon arrival at MMC on November 27, he described his pain as a 10 on a scale of 10.  *See* Records, Vol. II(3)(A).

24.     In the first few months after the accident, the plaintiff was prescribed Paxil to manage anxiety attacks arising chiefly from worry over how he would pay his bills.  A

---

[7] Sepsis is "[t]he presence of various pathogenic organisms, or their toxins, in the blood or tissues[.]"  Stedman's at 1619.  Enterobacter is a type of bacteria.  *See id.* at 597.

psychologist who assessed him at New England Rehab on November 20, 2006, found him to be "experiencing significant levels of anxiety and underlying dysphoria associated [with] his current physical incapacity, post traumatic stress, and pain symptoms[,]" as well as distress "about financial hardship for lost time from work[.]"    Records, Vol. II(2)(C), HealthSouth Interdisciplinary Progress Note/Psychology dated 11/20/06.  As of December 28, 2006, he was noted to be emotionally stable and ready for readjustment to his home environment.  *See* Records, Vol. II(2)(C), HealthSouth Interdisciplinary Progress Note/Psychology dated 12/28/06.

25.    The plaintiff was discharged home from New England Rehab on December 29, 2006.  *See* Records, Vol. II(2)(C), HealthSouth Interdisciplinary Discharge Instructions dated 12/29/06.  At that time, his pain was managed through prescriptions for 300 milligrams of Neurontin three times daily, a Fentanyl patch to his chest wall, and five-milligram Oxycodone tablets as needed for breakthrough pain.  *See* Records, Vol. II(2)(C), Medication Schedule. Treating practitioners later prescribed 40 milligrams of Opana daily instead of the Fentanyl patch, and Percocet instead of Oxycodone for breakthrough pain.  *See, e.g.*, Records, Vol. II(3)(C), Vol. II(5), note of Eric D. Hoffman, M.D., dated 9/25/07 & Vol. II(6), notes of George W. Stockwell, D.O., dated 5/10/07 & 7/24/07.  The plaintiff continues to be prescribed Neurontin or its generic version, Gabapentin, for nerve pain.  *See, e.g.*, Records, Vol. II(11), Rehabilitation Medicine Consultation note of Vincent P. Herzog, D.O., dated 10/17/08, at 2.

26.    Fentanyl, Oxycodone, Opana, and Percocet are all narcotics.  *See id.*  While the plaintiff did not consider himself to be addicted to narcotics, he developed a physical dependency on them.  Commencing in October 2008, Dr. Herzog began attempting to wean him from narcotics, substituting Methadone for Opana.  *See id*. at 4.

27.     The plaintiff's post-discharge course did not initially go smoothly.  On New Year's Eve 2006, he was transported by ambulance to Southern Maine Medical Center.  He feared that he had again developed an infection after his leg became extremely swollen and crampy and he experienced hot and cold flashes.  *See* Records, Vol. II(4)(A).  While, at hearing, he attributed this acute illness to Fentanyl withdrawal, he was assessed by emergency room staff as suffering from a viral illness.  *See* Records, Vol. II(4)(B).

28.     In early January 2007, the plaintiff commenced an intensive course of outpatient physical therapy.  *See* Records, Vol. II(9).  As of February 20, 2007, he was noted to be working to regain knee range of motion but still using crutches for ambulation and experiencing persistent pain in his knee.  *See* Records, Vol. II(5), Report of Matthew R. Camuso, M.D., dated 2/20/07.  He was warned that he was at risk of developing arthrosis of the injured knee.  *See id.*[8]  As of March 26, 2007, he was improving and able to walk with a cane but still had decreased range of motion and function of the right leg and reported a fair amount of pain in the region of his right knee.  *See* Records, Vol. II(8).

29.     On September 6, 2007, the plaintiff underwent a fourth surgery, a right knee arthroscopy, to remove scar tissue and the hardware in his knee.  *See* Records, Vol. II(10)(A).  He was diagnosed postoperatively with osteoarthritis of that knee.  *See id*.  He recalls his surgeon having described the knee as "bone on bone."  With the aid of aggressive postoperative physical therapy, he was able to achieve near full extension of his right leg and flexion to approximately 105 to 110 degrees.  *See* Records, Vol. II(5), note of Dr. Hoffman dated 11/26/07.

---

[8] Arthrosis is osteoarthritis.  *See* Stedman's at 151.

30.    About six weeks after his fourth surgery, the plaintiff developed increased swelling and discomfort in his right leg.  *See* Records, Vol. II(5), Letter to Dr. Hoffman from Jens Eldrup-Jorgensen, M.D., dated 11/12/07.

31.    As of January 29, 2008, the plaintiff was doing well and his pain was under acceptable control with use of his chronic pain medications, Opana and Percocet.  *See* Records, Vol. II(5), note of Dr. Hoffman dated 1/29/08.  He had returned to work and was cleared to continue performing the work he was then doing, with no kneeling, squatting, carrying greater than 15 pounds, or pushing or pulling objects greater than 20 pounds, and with limited stair use. *See id.*

32.    On February 28, 2008, the plaintiff reported increasing trouble with his right knee.  *See* Records, Vol. II(5), note of Dr. Hoffman dated 2/28/08.  By the end of the workday, his knee pain was severe, and he noticed increased swelling.  *See id*.  At Dr. Hoffman's suggestion, he began receiving a series of Synvisc and corticosteroid injections into his right knee.  *See id*.; *see also* Records, Vol. II(5), note of Dr. Hoffman dated 5/23/08.

33.    On July 14, 2008, the plaintiff underwent a fifth accident-related surgery to address his continuing problems with pain and swelling, felt to be attributable at least in part to a torn meniscus, the presence of a loose body in his suprapatellar pouch, an apparent tear in his anterior cruciate ligament ("ACL"), and a fascial hernia on his thigh.  *See* Records, Vol. II(3)(D) & Vol. II(5), note of Dr. Hoffman dated 6/17/08.[9]  In anticipation of the surgery, Dr. Hoffman noted, "He sustained a severe trauma to this knee, and this certainly will not provide him a 'normal' knee but, hopefully, we will make some gains with his pain and swelling and perhaps even motion."  Records, Vol. II(5), note of Dr. Hoffman dated 6/17/08.

---

[9]  The meniscus is a "crescent-shaped intraarticular fibrocartilage" found in certain joints, including the knee. Stedman's at 1091.  "Suprapatellar" is above the patella.  *See id*. at 1731.

34.     During the July 14 surgery, Dr. Hoffman performed several procedures, including a right knee diagnostic and operative arthroscopy with partial medial and lateral meniscectomy, a chondroplasty, patellofemoral, medial, and lateral compartments, arthroscopic removal of a large suprapatellar pouch loose body, and open repair of a fascial hernia of the right lateral thigh.  *See* Records, Vol. II(3)(D).[10]

35.     The surgery brought the plaintiff some relief, particularly with respect to his hernia, but he continued to complain of increased leg pain and swelling with activity, worse at the end of the day.  *See* Records, Vol. II(5), note of Dr. Hoffman dated 9/25/08.  He continued to receive Synvisc or corticosteroid injections.  *See id.*  He also underwent a new course of physical therapy commencing in August 2008.  *See* Records, Vol. II(9).

36.     In October 2008, Melissa Bell, the nurse manager who was managing the plaintiff's workers' compensation case for third-party administrator TD Banknorth Insurance Company ("TD Banknorth"), referred him to a physiatrist specializing in pain control and physical medicine, Vincent P. Herzog, D.O.  *See* Records, Vol. II(11), note of Dr. Herzog dated 10/17/08.  The plaintiff complained of chronic pain, aching, numbness, pins and needles, stabbing, and swelling in his right leg.  *See id.*  Dr. Herzog substituted Methadone for Opana, while continuing the plaintiff on Neurontin/Gabapentin.  *See id.* at 4.  As of July 8, 2009, Dr. Herzog felt that the plaintiff might be able to wean himself off of medications this summer.  *See* Records, Vol. II(11), note of Dr. Herzog dated 7/8/2009.

---

[10] A meniscectomy is "[e]xcision of a meniscus, usually from the knee joint."  Stedman's at 1091.  A chondroplasty is "[r]eparative or plastic surgery of cartilage."  *Id.* at 342.

37.     The plaintiff has incurred injury-related medical expenses totaling $223,670.33. *See* Exh. 4.[11]

### C.  Earnings Losses To Date

38.     The plaintiff earned an average of $695.47 in gross wages, including overtime pay, during his first two full weeks of employment at Roberts Co. prior to his injury.  *See* Exhs. 6, 9.

39.     He was totally disabled from work from November 4, 2006, through December 2, 2007.  He returned to work at Roberts Co. on December 3, 2007.  *See* Exh. 6.

40.     For the eight weeks that the plaintiff was totally disabled in 2006 and the 48 weeks that he was totally disabled in 2007, his earnings loss totaled $38,946.32.[12]

41.     When the plaintiff returned to work in December 2007, his injuries precluded him from rejoining the pump crew.  Initially, he could not climb at all.  Although he now can climb occasionally, he continues to lack the physical capacity required for the pump crew job, including the capacity to climb in and out of holes as much as 30 feet deep for an entire day or to rescue a fellow worker from a confined space in the event of an emergency.  He can take only one step at a time when climbing a ladder and must hold his right leg out straight when he crouches.

---

[11] I have double-checked the plaintiff's calculations against the TD Banknorth materials from which they were derived.  They are correct.  A third party has paid at least a portion of the plaintiff's medical bills.  *See* Exh. 4. However, as the plaintiff's counsel observed at hearing, the collateral source rule renders such payments irrelevant for purposes of calculation of damages.  *See, e.g., St. Francis De Sales Credit Union v. Sun Ins. Co. of N.Y.*, 2002 ME 127, ¶ 20, 818 A.2d 995, 1001-02 ("The collateral source doctrine provides that, if a plaintiff is compensated in whole or in part for his damages by some source independent of the tortfeasor, he is still permitted to have a full recovery against the tortfeasor.  The premise underlying this rule is that either the injured party or the tortfeasor will receive a windfall if part of a loss is paid by an independent source, and, as between the injured party and the tortfeasor, the injured party should reap the benefit of the windfall.") (citations and internal punctuation omitted).

[12] The plaintiff calculated an earnings loss of $40,136.72 based on seven weeks of total disability in 2006 and 47 weeks of total disability in 2007.  *See* Exh. 6.  His calculations are incorrect.  By my calculations, he was totally disabled for eight weeks in 2006 and 48 in 2007, a total of 56 weeks.  Multiplying $695.47 times 56 equals $38,946.32.

42.      Roberts Co. Vice President David Mersereau, who had been hired subsequent to the plaintiff's accident but had been informed about it, was concerned, given the nature of the plaintiff's injuries, that he might not be able to perform any function at all for the company. However, Mersereau assigned him to a general laborer position because it was flexible, allowing the plaintiff to fill in when and as he could and permitting Mersereau to work around any absences.

43.      In the general laborer position, the plaintiff is responsible for coring and drilling holes in concrete.  He is also able to perform pump crew work if it is "ground level" work, such as a culvert job, and if he is feeling physically well enough to undertake it.

44.      The plaintiff has continued to work at Roberts Co. in a general laborer position since his return to work on December 3, 2007.  Mersereau continues to assign him to functions that do not necessarily need to be done that day or that can be done in half a day.

45.      The plaintiff initially earned $12.50 per hour in the general laborer job. Beginning on July 10, 2008, he received a raise to $13.50 per hour.[13]

46.      The plaintiff continues to miss entire days of work, or requests to leave work early, for medical reasons such as because his medications are not adequately controlling his pain or he has doctor's or physical therapy appointments.  Mersereau also from time to time has suggested that the plaintiff leave work early after observing him pushing himself too hard and suffering apparent pain or discomfort.  Mersereau has observed the plaintiff's right knee swollen. The plaintiff often misses a day or two of work in a week and even more time in the winter.

---

[13] The plaintiff's calculations incorporate a starting date of October 23, 2008, for his raise.  *See* Exh. 6.  However, the underlying TD Banknorth data included in Exhibit 6 indicate that the raise took effect on July 10, 2008.  *See id*. I have used the latter figure.

47.     The plaintiff is a conscientious worker.  He loves working at Roberts Co. and wants to work.

48.     Since returning to work, the plaintiff has been able to earn some overtime pay, usually when he is able to assist the pump crew in performing culvert work.  However, it is less overtime than he would have worked had he remained on the pump crew.  Since returning to work, he has worked an average of 58.2 hours of overtime annually.[14]

49.     During the four weeks that the plaintiff worked in 2007, he earned $1,516.49 less in gross wages than he would have earned had he remained on the pump crew.  *See id.*  In 2008, he earned approximately $17,000 less.  *See id.*[15]  From January 1, 2009, through June 25, 2009, he earned approximately $7,500 less.  *See id.*[16]

50.     The plaintiff's earnings loss from December 3, 2007, through June 25, 2009, totals $25,989.91.[17]

---

[14] I derive this figure from the TD Banknorth data included in Exhibit 6, from which I calculate that the plaintiff earned $969.73 in overtime from January 1, 2008, through the time of his July 2008 raise (that is, amounts above base pay of $500 per week) and $720.85 in overtime since then (that is, amounts above base pay of $540 per week). He therefore worked 51.72 hours of overtime prior to his raise ($969.73 ÷ $18.75) and 35.6 hours of overtime thereafter ($720.85 ÷ $20.25). His average annual overtime for that approximately 18-month period accordingly is 58.2 hours of overtime (51.72 + 35.6 ÷ 18 x 12).

[15] The precise figure is $16,967.39. The plaintiff calculated a differential for 2008 of $15,977.50. *See* Exh. 6. However, he made several calculation errors. First, he mis-transcribed three numbers from the underlying source, a TD Banknorth wage sheet. He listed gross wages of $594.59 for January 10, 2008, $357.74 for January 17, 2008, and $187.75 for March 13, 2008. *See id.* The correct numbers are $594.69, $375.75, and $188.75, respectively. *See id.* Second, as noted above, he mistakenly indicated that his raise commenced in October 2008 when it commenced in July 2008. Third, although he reasonably assumed, consistent with Mersereau's testimony, that he would have received a $1 raise in base hourly pay had he remained on the pump crew, he factored the increase only into base pay and not into overtime pay in arriving at a post-raise pump crew weekly rate of $735.47. I arrive at a post-raise pump crew weekly rate of $751.11, calculated by multiplying the pre-raise rate of $695.47 times 13.5 and dividing that sum by 12.5.

[16] The precise figure is $7,506.03. The plaintiff miscalculated the figure as $7,099.39 using the incorrect post-raise pump crew weekly rate of $735.47. *See* Exh. 6. As explained above, the correct weekly rate is $751.11.

[17] At hearing, the plaintiff amended his request for past lost earnings, seeking a higher amount for the period beginning in 2008 based on Mersereau's testimony that experienced pump crew workers were earning $16 to $17 per hour and that the plaintiff would have been earning at least $17 per hour had he remained on the pump crew. Nonetheless, Mersereau did not explain when the base rate of pay for experienced pump crew workers was raised to $17 per hour nor whether the plaintiff would have qualified as an experienced pump crew member as of January 1, 2008, only a little over a year after starting his employment. I decline to assume that his base pay would have been that high at any period prior to the date of the hearing.

51.     Combining the period of total disability and the period since his return to work, the plaintiff suffered an accident-related earnings loss totaling $64,936.23 through June 25, 2009.[18]

### D.  Impact on Plaintiff's Life Generally

52.     The plaintiff married Robin in September 2007, nearly a year after the accident. They separated in October 2008 and are in the process of obtaining a divorce.   While the accident cannot fairly be said to have caused the breakup, its after-effects contributed to it. Robin, who was very supportive of the plaintiff in the immediate aftermath of the accident, became increasingly affected by his mood swings, loss in earnings, and physical limitations, including his diminished ability to engage in family activities and help with the care of the couple's daughters.   Since the separation, the plaintiff and Robin have shared custody of the girls, now six and four years old, who live with the plaintiff on Tuesdays, Thursdays, and Saturdays.

53.     The accident also affected the plaintiff's relationship with his children, particularly his older daughter, Jordan, who took the change in her father hard.   Before the accident, he had no physical limitations in playing with them or taking them on family outings. Now, if his daughters ask to go outside, he sometimes must ask them to wait until his medication takes effect and he is in less pain.   He cannot bend to talk to his daughters at eye-level or run, play, or go sliding with them as he once did.   Harmon recalled that on a recent trip to Old Orchard Beach, Jordan informed her that she did not want her father to go on a certain ride because she was afraid that he would hurt his leg.   Jordan, who helped with care of her father in

---

[18] A third party has paid at least a portion of the plaintiff's lost wages.  *See* Exh. 9.  However, as noted above, the collateral source rule renders such payments irrelevant for purposes of calculation of damages.  *See, e.g., Sun Ins. Co*, 2002 ME 127, ¶ 20, 818 A.2d at 1001-02.

the aftermath of the accident, frequently worries about whether her father can do certain things without hurting his leg.

54.     The plaintiff used to love hiking, backpacking, and tenting.  He would sometimes spontaneously grab a backpack and tent and head out into the woods.  He can no longer engage in such activities unless they are pre-planned and easy.  He previously enjoyed riding on ATVs and snowmobiles, riding as far as Canada.  He can now ride for no longer than about half an hour.  He was an avid hunter, enjoying long moose hunts entailing as much as a 50-mile walk in the woods, and he loved to fish.  Now he hunts only for deer in the vicinity of his house and fishes in a small radius, instead of finding a river and following it, as he once did.

55.     The plaintiff generally is an upbeat and positive person, described by expert vocational witness Eileen Kalikow as able to make "lemonade out of lemons."  However, some days he dwells on the fact that his wife is gone and that he can do considerably less with his children, and he feels that the accident ruined his life.  Sometimes at night he awakes from a bad dream in which he is reliving the accident and the sensation of having his leg crushed.

### E.  The Plaintiff's Current State

56.     A typical day for the plaintiff commences at 5 a.m. to 6 a.m., when he wakes up and stretches and loosens his right leg, which becomes stiff overnight.  He describes himself as similar to "an 80-year-old man getting out of bed."  He must quickly take his medications, currently Methadone and Gabapentin, the generic form of Neurontin, which controls nerve pain.  If he neglects to do so, his leg gets restless.

57.     After the plaintiff gets out of bed, he walks around a bit to loosen up.  He dresses, and either his father or his girlfriend takes him to work.  He, other production crew members,

and the truck drivers huddle in the garage, waiting until their boss, Mersereau, gives them orders for the day.  After receiving those orders, they start work at about 7:10 a.m.

58.     At work, the plaintiff tries not to pay too much attention to what the pump crew is doing.  It is "salt in the wound" that he has lost his position as one of the elite, higher-earning pump crew and would have been its most experienced member had he remained physically able to perform the job.

59.     Prior to the accident, the plaintiff used to feel physically exhausted when he returned home from work.  Now, on returning home, he is in pain.  He experiences pain every day ranging from a three to a 10 on a scale of 10.  On days that it is a 10, he cannot go to work. He stays in bed with a heat pad and/or ice.  Even on a good day, his leg can feel stiff, with burning and tingling sensations.  On days that he makes it to work, a flare-up in pain can cause him to leave work early, for example, if he steps on a rock.

60.     The plaintiff's leg still swells up, and he sometimes walks with the aid of a cane. He has a hard time getting into a car.

61.     The plaintiff lives in a second-floor apartment.  Laundry facilities are downstairs. On several occasions, he has fallen on the stairs while carrying groceries, laundry, or one of his daughters.  He often has to climb one step at a time.  His children like to go outside, but he has to think before he attempts to go downstairs.  On bad days, it is virtually impossible for him to get down the stairs to leave his home.

62.     The plaintiff cannot fully extend his right leg.  When he stands, his right heel is about an inch and a half off the ground because of lack of elasticity in his calf muscles.  His knee sometimes also gives out.

63.     The plaintiff has a scar on his left inner thigh from surgery to harvest a vein, as well as several prominent scars on his right leg and knee.

64.     While the plaintiff tries to make the best of his situation and will undertake activities despite his pain for the sake of his girlfriend and his daughters, he continues to have periods during which his mood is affected by pain.  About once every two weeks, he becomes withdrawn and wants to be left alone.  As he described it, "The leg makes my life, if you will."

### F.  Expected Future Medical Treatment

65.     As a result of his injuries, the plaintiff is expected to require ongoing evaluation and pain management for the rest of his life, physical and occupational therapy on an as-needed basis, and more than one replacement of his right knee.

66.     His doctors are trying to put off replacing his knee for the first time as long as possible because knee replacements last only a limited period of time, currently from 10 to 15 years depending on the individual's activity level, and successive knee replacement surgeries require cutting away more of a patient's own bone.

67.     As a result of injuries incurred in the accident, the plaintiff will require:

A.     Evaluations: (i) orthopedic evaluation once a year at a cost of $350 per evaluation, for a lifetime cost of $17,745 based on a life expectancy of 50.7 years, (ii) vascular evaluation once a year at a cost of $259 per evaluation, for a lifetime cost of $13,131.30, (iii) physical therapy evaluation four times in his lifetime at a cost of $180 per evaluation, for a lifetime cost of $720, and (iv) occupational therapy evaluation four times in his lifetime at a cost of $180 per

evaluation, for a lifetime cost of $720.  *See* Exh. 5, Life Care Plan, § I (Evaluations).[19]  Total projected lifetime cost: $32,316.30.

B.     Treatment/Therapies: (i) orthopedic treatment three times a year at a cost of $300 per treatment, for a lifetime cost of $45,630, (ii) three courses of physical therapy in his lifetime, each twice a week for five months (20 weeks) at a cost of $115 per hour, for a lifetime cost of $13,800, (iii) three courses of occupational therapy in his lifetime, each twice a week for three months (12 weeks) at a cost of $115 per hour, for a lifetime cost of $8,280, (iv) Synvisc injections as needed, at a cost of $1,464 for a series of three injections, (v) intraarticular corticosteroid injections as needed, at a cost of $170.60 per injection, and (vi) five MRIs in his lifetime, at a cost of $1,100 each, for a lifetime cost of $5,500.  *See* Life Care Plan, § II (Treatment and Therapies).[20]  Total projected lifetime cost: $74,844.60.

C.     Medications: (i) a prescription for 300 milligrams of Gabapentin twice a day at a cost of $75.99 per month, for a lifetime cost of $46,232.32, and (ii) a prescription for five

---

[19] My figures are drawn from the Life Care Plan submitted by the plaintiff's expert Eileen Kalikow, owner of Vocational Resources and a vocational rehabilitation counselor and career counselor.  *See* Exhs. 5, 10.  In many instances, Kalikow supplied a range of costs for expected evaluations and treatments.  *See* Exh. 5.  The plaintiff asks the court simply to adopt the higher figures in the ranges.  *See id.*, Life Care Plan Summary.  I decline to do so.  In this and other instances in which Kalikow supplied ranges of costs, I have adopted the average of the two endpoints in the range, arriving at a figure that I believe will fairly compensate, but not overcompensate, the plaintiff.  As regards the category of evaluations, I exclude the sum of $1,200 for the cost of two vocational evaluations.  *See* Exh. 5, Life Care Plan, § I (Evaluations).  For reasons described more fully below, the plaintiff has failed to adduce persuasive evidence that he likely will pursue further education or retraining as a result of the injuries incurred in his accident.  In arriving at a life expectancy for the plaintiff of 50.7 years, Kalikow supportably relied on life expectancy tables published by the National Center for Health Statistics, U.S. Department of Health and Human Services Centers for Disease Control and Prevention.  *See* Exh. 5, Evaluation and Life Care Plan Addendum dated July 17, 2009, at 2.

[20] At hearing, Kalikow explained that she had not projected the cost of injections over the plaintiff's lifetime because there are medical limitations on the number of injections that a person can have in one site in a lifetime.  I include only those costs reflected in her Life Care Plan of $1,464 for a series of three Synvisc injections and $170.60 for a corticosteroid injection.  *See* Life Care Plan, § II (Treatment and Therapies).  I exclude Kalikow's projected lifetime costs of $6,000 for acupuncture sessions and $6,120 for vocational rehabilitation.  *See id.*  While Kalikow explained that, based on her training and expertise, she considers acupuncture an efficacious treatment, and it well may be, she acknowledged, and it is clear from review of the plaintiff's medical records, that no treating medical practitioner to date has recommended it.  With respect to vocational rehabilitation, the plaintiff has adduced no persuasive evidence that he likely will pursue further education or retraining.

milligrams of Methadone a day at cost of $10.99 per month, for a lifetime cost of $6,686.32. *See* Life Care Plan, § III (Medications).[21]  Total projected lifetime cost: $52,918.64.

        D.     <u>Right-Knee Replacements</u>: two right knee replacements in his lifetime at a cost of $51,661.50 each, for a lifetime cost of $103,323, with related hospitalization costs of $17,500 as a result of complications of surgery. *See* Life Care Plan, § IV (Additional Treatment).  Total projected lifetime cost: $120,823.[22]

        68.     Projected future medical costs attributable to the plaintiff's injury hence total $280,902.54.

### G.  Expected Future Earnings Losses

        69.     The Roberts Co. pump crew currently consists of four individuals.  Two occupy supervisory positions, one as a lead worker and one as manager of the pump crew.  Roberts Co. truck drivers also pitch in to help the pump crew as and when needed.  The two most experienced pump crew employees, both of whom have been with the company for about two years, earn between $16 and $17 per hour plus overtime.  Had the plaintiff remained on the pump crew, he would by now have been earning $17 per hour.  Thus, he would have been earning total base pay of $35,360 annually ($17 x 40 x 52) plus annual overtime pay, at an

---

[21] I am mindful that Dr. Herzog indicated in a recent progress note that the plaintiff *might* be able to wean himself off of medications this summer.  *See* Records, Vol. II(11), note of Dr. Herzog dated 7/8/2009.  However, given the equivocation of the note, as well as testimony by TD Banknorth case manager Bell that the plaintiff will require pain management for the rest of his life, I conclude that he more likely than not will require the pain management regimen projected by Kalikow.  That said, I exclude the cost of Ibuprofen, which Kalikow projects that the plaintiff will require as needed at a cost of $5.99 per 100 tablets.  *See* Life Care Plan, § III (Medications).  The plaintiff also excluded that cost from his damages request.  *Compare id. with* Life Care Plan Summary.

[22] I have excluded two other categories of projected costs contained in the Life Care Plan, the projected cost of between $160,000 and $200,000 to purchase a one-floor home or condominium, and projected costs of (i) between $6,868 and $7,388 for a two-year associate program at Southern Maine Community College, (ii) $190 each for two computer training courses, and (iii) $1,000 for a computer.  *See* Life Care Plan, §§ V (Residential Accommodations) & VI (Vocational Training).  Kalikow's rationale for including the cost of a home or condominium was that the plaintiff currently lives in a walk-up apartment, presenting an obstacle to his functioning in view of his difficulty climbing stairs.  However, she acknowledged at hearing that first-floor apartments are available to rent.  The plaintiff presented no evidence that he had an interest in pursuing a college education.

average of 10 hours per week, of $13,260 ($25.50 x 10 x 52), for total gross compensation of $48,620 annually.

70.     The plaintiff's actual earnings for 2008 and the first half of 2009 averaged $21,739.11 annually ($20,585.83 + $12,022.83 ÷ 18 x 12).  *See* Exh. 6.  The annual differential between what the plaintiff now earns and what he would have earned had he remained on the pump crew therefore is approximately $27,000.[23]

71.     Had the plaintiff not been injured, he likely would have remained on the Roberts Co. pump crew.  He found the job challenging, enjoyed the problem-solving it entailed, and planned to remain in the position indefinitely.  His employer was pleased with his work.  Roberts Co. does not impose any age limit on pump crew workers.  One truck driver who assists the pump crew remains capable of doing the job at the age of 63.

72.     Post-injury, the plaintiff likely will remain in his current position with the Roberts Co., at least as long as he is physically able to do so.  He has long-standing connections with the company, both through his father's employment there and his own prior work for the company commencing during summers in high school.  The company has been very accommodating to him.  He credibly testified that he loves his job.

73.     At hearing, the plaintiff did express keen interest in becoming a heavy equipment operator, explaining that he had read an advertisement for a Caterpillar school in Georgia that offers such training and purports to help its graduates find jobs paying $20 to $25 per hour.

---

[23] The precise figure is $26,880.89 ($48,620 - $21,739.11).  The plaintiff arrived at an annual differential number of $28,000, but his figure is flawed, *inter alia*, by his failure to take into account the half year of 2009 earnings for which figures are available.

74.     Unfortunately for the plaintiff, that job goal is likely to be unrealistic, according to Kalikow's professional opinion.  Such jobs require use of a great deal of force to operate pedals and would cause undue additional wear and tear on his bad knee.

75.     Kalikow has recommended that the plaintiff obtain his GED and go on to complete at least two years of college.  *See* Life Care Plan, § VI (Vocational Training).  Were he to do so, his earnings capacity presumably would increase.  Nonetheless, there is no evidence that the plaintiff will choose that route.  He expressed a desire to obtain a GED only insofar as the Caterpillar school requires applicants to possess one.  Apart from that, he gave no indication of any interest in higher education.

76.     For purposes of calculating future lost earnings, I therefore presume that the plaintiff will remain in his general laborer position at Roberts Co. and that, but for the accident, he would have remained a pump crew worker, earning approximately $27,000 more annually than he now earns.

77.     The plaintiff, who is now 26, has a work life expectancy of 33 years.[24]  His projected future accident-related earnings loss accordingly is $891,000 ($27,000 x 33).

---

[24]  At hearing, Kalikow projected the plaintiff's earnings loss based on an assumption that he would work for an additional 41 years, until he is eligible for full Social Security retirement benefits at age 67.  However, she acknowledged that despite the plaintiff's strong work ethic, his injuries raise doubt that he can continue to work that long in his current position.  She also acknowledged that so-called work life expectancy tables exist and that, using such a table, the plaintiff's work life expectancy would be less than 41 years.  I take judicial notice that the United States Department of Labor, Bureau of Labor Statistics, last published work life expectancy tables in 1986.  *See* Bureau of Labor Statistics, U.S. Dep't of Labor, Worklife estimates.  According to those tables, in 1979-80, a 26-year-old man currently active in the work force had a work life expectancy of 32.7 years, a 26-year-old white man currently active in the work force had a work life expectancy of 33.3 years, and a 26-year-old man with less than a high school education currently active in the work force had a work life expectancy of 29.0 years.  *See* Bureau of Labor Statistics, U.S. Dep't of Labor, Bull. 2254, Worklife Estimates: Effects of Race and Education (Feb. 1986), at Tables A-1, A-2, & A-3.  Even taking into account that the BLS projections are outdated, they appear more closely aligned with the plaintiff's realistic prospects, in view of his injuries and his limited education, than a projection that he will work without interruption until he reaches his full Social Security retirement age.  Using those projections as a guide, I conclude that his work life expectancy is 33 years.

## H.  Representation of KW

78.     David Walsh is the father and legal guardian of KW.  *See* Affidavit of David Walsh (Docket No. 27) ¶ 2.  KW lives with his mother, father, and siblings in Massachusetts.  *Id*. At all material times, Walsh has been represented by Eric Eisenberg of the law firm Hinckley, Allen & Snyder, LLP, and has given Eisenberg full authority to represent him and KW.  *Id*. ¶ 4.

79.     Walsh and KW reached a comprehensive settlement with the plaintiff whereby Walsh assigned the plaintiff his rights to pursue Walsh's homeowner's insurance company, MPIUA.  *Id*. ¶ 5.  Walsh was aware that Eisenberg allowed a default to enter against himself and KW and that a damages hearing had been set.  *Id*. ¶ 6.  Walsh and KW planned to continue to honor the terms of the settlement agreement and not appear at the hearing.  *Id*.  As parent, guardian, and next friend of KW, Walsh believes that this course of action is in KW's best interests.  *Id*. ¶ 7.  He has waived, on behalf of himself and KW, three days' notice that had been given to him before the hearing.  *Id*. ¶ 10.[25]

80.     Eisenberg was duly authorized to accept service of process in this case and did so on behalf of Walsh and KW.  Affidavit of Eric F. Eisenberg, Esq. (Docket No. 26) ¶¶ 1, 5.  He accepted service regarding the damages hearing in this action pursuant to the terms of the settlement agreement between the plaintiff and his clients.  *Id*. ¶ 7.  He acknowledged his clients' right to be present for the default judgment hearing.  *Id*. ¶ 8.  His clients intended to honor the terms of the settlement agreement, to not pursue a defense to any default judgment, and to not appear at the hearing.  *Id*. ¶ 7.

---

[25] This presumably refers to the requirement that "[i]f the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application [for a default judgment] at least 3 days before the hearing."  Fed. R. Civ. P. 55(b)(2).

## II.  Proposed Conclusions of Law

1.      Federal Rule of Civil Procedure 55(b)(2) provides, in relevant part:

> A default judgment may be entered against a minor . . . only if represented by a general guardian, conservator, or other like fiduciary who has appeared.  If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 3 days before the hearing.

Fed. R. Civ. P. 55(b)(2).

2.      The Eisenberg and Walsh affidavits constitute a limited or special "appearance" for purposes of Rule 55(b)(2) of KW's general guardian, Walsh, and two individuals acting as his fiduciaries, Walsh and Eisenberg.

3.      The affidavits, which were filed on June 22 and 24, 2009, make clear that Walsh and KW were informed of the instant hearing well in advance of its occurrence and deliberately chose not to attend, and that Walsh considers the decisions not to defend against this action and not to attend the damages hearing to be in KW's best interests.  In any event, on behalf of himself and KW, Walsh waives the requisite three-day written notice.

4.      Default judgment may enter against both Walsh and KW in accordance with the dictates of Rule 55(b)(2).

5.      The entry of default against Walsh and KW establishes their liability to the plaintiff on his theory of negligence.  "There is no question that, default having been entered, each of plaintiff's allegations of fact must be taken as true and each of its claims must be considered established as a matter of law."  *In re The Home Rests., Inc*., 285 F.3d 111, 114 (1st Cir. 2002) (citation and internal punctuation omitted).

6.      "A hearing may be required, however, to set damages when the amount is in dispute or is not ascertainable from the pleadings."  *Id.; see also, e.g*., Fed. R. Civ. P. 55(b)

(unless a plaintiff's claim is for a sum certain or a sum that can by computation be made certain, the plaintiff must apply to the court for a default judgment); *KPS & Assocs., Inc. v. Designs by FMC, Inc.*, 318 F.3d 1, 19 (1st Cir. 2003) ("While a default . . . constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is susceptible of mathematical computation.") (citation and internal punctuation omitted).

7.     The plaintiff is entitled to recover sums that fairly, reasonably, and adequately compensate him for past and future medical expenses and diminished earnings capacity attributable to the accident. *See, e.g., Goldstein v. Sklar*, 216 A.2d 298, 308 (Me. 1966) (plaintiff injured by defendant's negligence entitled to recover, *inter alia*, sum that would "fairly, reasonably and adequately compensate him for . . . loss due to diminished earning capacity, past and future, proximately ascribable to his injury"); *Swiridowsky v. Kennebec Mental Health Ass'n*, No. CIV.A. CV-98-220, 2000 WL 33675676, at *4 (Me. Super. Ct. Sept. 5, 2000) (plaintiff injured by defendant's negligence entitled to recover, *inter alia*, "compensation for past and future medical expenses attributable to the injury").   He has, by hearing, proved the following such damages:

A.     Medical expenses to date of $223,670.33.

B.     Lost earnings to date of $64,936.23.

C.     Projected future medical expenses of $280,902.54.

D.     Expected future earnings losses of $891,000.

8.     A plaintiff injured by a defendant's negligence is also entitled to recover a sum that fairly, reasonably and adequately compensates him or her for permanent physical impairment, as well as for emotional and physical pain and suffering and loss of enjoyment of life attributable to that negligence. *See, e.g., Hargrove v. McGinley*, 2001 ME 36, ¶ 9, 766 A.2d

587, 591 ("An award for permanent impairment provides damages to compensate for permanent loss, loss of use, restriction of motion or impairment of some bodily system or member. It addresses losses separate from pain, suffering, mental anguish or medical expenses. Although a condition which constitutes a permanent impairment may result in both medical expenses and pain, suffering and mental anguish, it is also possible to have a permanent impairment without either future pain, suffering and mental anguish or future medical expenses. Thus, permanent impairment, where properly generated, is an element of damages for the jury to consider separately from any other element of damage."); *Goldstein*, 216 A.2d at 308 (plaintiff injured by defendant's negligence entitled to recover, *inter alia*, sum "that would fairly, reasonably and adequately compensate him for his pain and suffering, past and future, mental and physical, as well as for his loss of health . . . proximately ascribable to his injury"); *Swiridowsky*, 2000 WL 33675676, at *4 (plaintiff injured by defendant's negligence entitled, *inter alia*, to "compensation . . . for her pain and suffering and loss of enjoyment of life").

9.     The plaintiff suffered a catastrophic injury on November 4, 2006. He has endured considerable and at times unbearable physical pain and suffering commencing with the moment of impact. He endured five surgeries and extremely painful complications, including compartment syndrome and sepsis. He is permanently impaired. As one of his doctors observed, his right leg will never be "normal." While he has made a remarkable recovery in the circumstances, his leg continues to become stiff, swollen, and painful, particularly with exertion. He has not regained full use of his right leg and likely never will.

10.     The plaintiff experienced fear, anxiety, post traumatic stress, and dysphoria, particularly in the immediate aftermath of his accident. The accident contributed to his estrangement from his wife and, ultimately, the initiation of divorce proceedings. It also affected

his relationship with his daughters, particularly his eldest daughter, Jordan, who now fears that normal family activities will hurt her father's leg.  Prior to November 4, 2006, the plaintiff was a young, healthy, and vigorous man who had no physical limitations in playing or interacting with his girls.  Now, he has trouble even crouching down to eye-level with them.  He testified persuasively and movingly that his inability to play freely with his daughters, who were only 1 and 3 at the time of the accident, breaks his heart.  While the plaintiff, to his credit, has maintained a fairly positive outlook, he continues to suffer from bouts of discouragement and unsociability as a result of his injuries.

11.    The accident, finally, has significantly curtailed the plaintiff's ability to engage in activities in which he took great pleasure, such as backpacking, camping, ATV riding, and hunting.

12.    It is difficult to place a dollar figure on suffering and losses such as those endured by the plaintiff.  However, I am satisfied that the sum of $750,000 would fairly and justly compensate him for emotional and physical pain and suffering, permanent impairment, and loss of enjoyment of life attributable to the defendants' wrongful conduct.[26]

13.    In addition to damages, the plaintiff seeks interest.  *See* Complaint at 2.  "In a diversity action, such as the present one, state law must be applied in determining whether and

---

[26] In reaching this figure, I have relied on a thoughtful 2006 law review article in which Professor Ronen Avraham of Northwestern University School of Law proposed that pain-and-suffering, or non-economic, damages be computed using a multiplier of past and expected future medical costs associated with the injury, ranging from a multiplier of 0.5 for medical costs of up to $100,000 to a multiplier of 1.25 for medical costs above $1,000,000.  *See* Ronen Avraham, Putting a Price on Pain-and-Suffering Damages: A Critique of the Current Approaches and a Preliminary Proposal for Change, 100 Nw. U.L. Rev. 87, 110 (2006).  For medical costs of between $500,001 and $1,000,000, like those in this case, Avraham proposed a multiplier of one.  *See id.*  He further persuasively reasoned that "multipliers should also vary by age in order to capture the fact that a younger person living with a disability or perpetual source of discomfort would require more compensation than an older person with a shorter life expectancy."  *Id.* at 111.  While Avraham did not address the manner in which age adjustments should be made, which was beyond the scope of his article, *see id.*, I have chosen to use a multiplier of approximately one and one half, rather than one, to take into account the plaintiff's age of barely 24 at the time of the accident, the permanent impairment he sustained, and  the more than 50 years of accident-related mental and physical pain and suffering, including loss of enjoyment of life, that he is expected to endure.

how much pre-judgment interest should be awarded." *Saint-Gobain Indus. Ceramics Inc. v. Wellons, Inc*., 246 F.3d 64, 69 n.1 (1st Cir. 2001) (citation and internal quotation marks omitted). The Law Court has "stated that the assessment of prejudgment interest serves two purposes in the ordinary civil context: first, it compensates an injured party for the inability to use money rightfully belonging to that party between the date suit is filed and the date judgment is entered; and second, it encourages the defendant to conclude a pretrial settlement of clearly meritorious suits." *Guiggey v. Great N. Paper, Inc*., 1997 ME 232, ¶ 7, 704 A.2d 375, 377 (citations and internal punctuation omitted).  An award of prejudgment interest serves the first of these two purposes, and is appropriate, in this case.

14.     With respect to civil actions such as this one, in Maine "prejudgment interest is allowed at the one-year United States Treasury bill rate plus 3%."  14 M.R.S.A. § 1602-B(3). The "one-year United States Treasury bill rate" is defined to mean "the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the last full week of the calendar year immediately prior to the year in which prejudgment interest begins to accrue." *Id.* § 1602-B(3)(A).  "Prejudgment interest accrues from the time of notice of claim setting forth under oath the cause of action, served personally or by registered or certified mail upon the defendant until the date on which an order of judgment is entered." *Id.* § 1602-B(5).

15.     KW and Walsh were served notice of the instant action on January 7, 2009.  *See* Docket No. 7.  The one-year United States Treasury bill rate for the last full week of  2008 (December 26, 2008) was 0.4 percent.  Hence, Plaintiffs are entitled to prejudgment interest running from January 7, 2009, to the date of judgment at the rate of 3.4 percent.

### III.  Conclusion

For the foregoing reasons, I recommend that the court **GRANT** the plaintiff's motion for default judgment against KW and Walsh and, consistent with the foregoing, enter judgment in favor of plaintiff, and against KW and Walsh, in the sum of $2,210,509.10 on his negligence claim, plus prejudgment interest at a rate of 3.4 percent accruing from January 7, 2009, through the date of judgment.[27]

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 19th day of August, 2009.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge

---

[27] I do not here address the plaintiff's request for costs, *see* Complaint at 2, the subject matter of which is covered by Local Rule 54.3.